Momphard and Melrose, you're up first. Thank you, and may it please the court. My name is Mark Melrose, I represent the plaintiff in this matter. It is an unconstitutional use of excessive force for a law enforcement officer to shoot a motionless man who is merely possessing a firearm, investigating a nocturnal disturbance, and is not threatening the officer or others. Well, you stated a lot there, and that's the whole case on a bill, so why don't you get into your argument as to why you believe this officer didn't act reasonably in the circumstances. Yes, sir, the lack of reasonableness is because Mr. Knibbs, at the time that he was shot, did not pose any threat to the officer. No, is that what the officer thought? The officer thought the man, Mr. Knibbs, was right behind the door with a gun ready to shoot through the door. Right. Was that fantasy? It's a reasonable officer, knowing the facts that were available to Mr. Momphard, would not have acted as Mr. Momphard did. This is not a case of misperception. The misperception cases that this court has decided all involve furtive or sudden movements, or turns of the body, or his do at this point, and then we can argue it. I mean, he, first of all, came to a scene where there was a dispute between neighbors. He thought there were nails in the boards in the front. He was told the man was intoxicated. He said that there had been disputes between the neighbors. He knocked on the door. Nobody answered. The lights were out. He goes next door, and the lights turn on, and he sees them turn on, and says, oh, they're home. He goes back, and he knocks on the door again. He hears a cuss word. He heard the footsteps coming to the door. He hears the gun being loaded. He thinks the guy's gonna shoot through the door. In order to get away from that, he crosses the window with a flashlight, and he sees the man there with a gun, and he fires, thinking he's about ready to be killed. That's the officer faced. Now tell me, should an officer stand there and defensive and not react? Your Honor, that's, essentially, many of those facts are what the defendant argues and what... Not argues. This is the undisputed record. Tell me, tell me what disputed, what fact there was not, was disputed. Your Honor, taking some of those things, Mr. Monfort says he went to the house first, and he announced twice before he went up the hill. None of the residents heard that or saw that. He testified to that, and nobody disagreed with it. Right. It's the absence of evidence in that, that they didn't hear anything. Well, he yelled. He said he yelled, and there's nothing to dispute that he did that. And then he went next door, and when the lights turned back on, he had assumed nobody was home. When the lights went back on, he's with the neighbor now, with Freeman. He says to Freeman, he says, oh, the lights went back on. He must be there. So the officer goes back to the house, and at that point, he hears the full movement. He hears the guy say F when he's being yelled at. He hears the footsteps coming to the door. He hears the gun being loaded. He instructs him to drop the gun. There's no indication that he did drop the gun, which really heightened the risk for him, and he thought he was going to be killed. Now, that's what the officer faced, and distinguish that from Sigmund and from the other courses, and, of course, the Supreme Court last week had this Hammer case, which I think was less threatening to the officer, and the court summarily found immunity and sent it back to, what, the Ninth Circuit? What Mr. Monford knew and what he testified to was that it was a civil dispute, that it was something... What's that got to do with it? The point is he's threatened. He believes he's going to be shot. I think it goes to the... We're talking about officer safety. Yes. Self-defense. I think it goes to the factors, the three-factor test, the severity of the crime at issue, whether there was the suspect or victim was trying to escape from... There was no crime being investigated. There was a domestic dispute being investigated. During the course of the investigation, he's faced with a life-threatening situation. We're not talking about necessarily a crime being committed. That's irrelevant to what this officer did and reacted to. Right. I think you'd stay with what the officer, a reasonable officer in Monford's situation should have done. Right. Your Honor, Mr. Monford's testimony was that he... The evidence most favorable to the plaintiff was sheriff's office was said one time. That's a fact that the district court judge did not consider because that's what Mr. Freeman, the witness, the ear witness who was nearby said one time, sheriff's office. Immediately after that, Mr. Monford hears the shotgun being racked. Immediately after that, Your Honor, Mr. Monford has decided, based on our evidence, that he is going to shoot Mr. Nibbs. No, no. He left out some critical facts. We hear the footsteps coming down to the door. We hear the fact that the gun is being cracked. We hear the most critical fact is that the officer instructs Nibbs to drop the gun. Right. And Nibbs doesn't do it. Your Honor... So now the question is, Monford thinks the gun is going to be aimed through the door at him, so he has to get away from the door. The problem with that, and this is why a jury needs to become involved, is Mr. Monford gave him no time to comply with the instruction. There's two things there. The evidence is for the plaintiff that almost immediately, quote-unquote, directly after, quote-unquote, or automatically, those are the three phrases used by Ms. Nibbs, the shots came almost immediately after the second put it down. Well, counsel, can we go back just a little bit time-wise? My impression here was that whether or not there's a factual dispute, and the factual dispute would be that Deputy Monford gave testimony at some places that said that Mr. Nibbs was aiming the shotgun at him almost at point-blank range. But you have an expert that testified that that could not be the case and that Mr. Nibbs had to have been standing with the shotgun pointed upwards in order to the light most favorable to the plaintiff, if the jury believed your expert did not believe Deputy Monford, was Deputy Monford entitled to shoot a homeowner under these circumstances if the gun was not pointed at him? That's correct, Your Honor, and that's the Hensley case also, and that's the Cooper case. If the homeowner is just possessing the firearm and is not pointing it at the officer, and Sheriff that weapon was pointed at the officer, there was no right to shoot him. He could not shoot to kill because Mr. Nibbs did not pose a threat. We have a pathologist, we have a crime scene expert, and we have a police use of force expert, all of whom opine that Mr. Monford's conduct was reckless, aggressive, and escalated the danger, and that Mr. Nibbs was shot while holding the shotgun. Well, that part goes to a different issue. It doesn't really go to the factual question at the time of the shooting, what was Mr. Nibbs doing with the gun? Yes, sir, and I agree in part, partly the state law claims there's more of a totality of the circumstances under the Lee case, everything that happened leading up to it. With respect to the forensic, and that's the Scott versus Hendricks case, because Mr. Nibbs is dead and cannot testify, the court is instructed to take a careful look at the forensic, scientific, and other expert testimony, which we presented three different experts in three different areas of expertise to demonstrate that all that Mr. Nibbs did, taking the light most favorably to the plaintiff, was go to investigate a nocturnal disturbance. He got no closer than six feet to his front door, was standing safely behind a solid wooden front door with a shotgun in the Pledge of Allegiance position pointed in a safe direction. That's all that Mr. Nibbs did. He didn't say anything, he didn't move, and he wasn't given time to comply with this instruction to put it down by somebody that he couldn't see, didn't know if it was law enforcement, and there's no blue lights. Yes? Counselor, can I ask a question about your describing, I think, you know, we obviously have to take the facts and the light most favorable to your client, and you're describing Mr. Nibbs' point of view. I think Judge Niemeyer was getting at the officer's point of view. Something that troubles me here is that the officer can't see what's going on. Many of the other cases we have, you know, the officer can see whether the gun is pointing down or someone's coming towards him, and here the victim is inside his own home, coming, you know, approaching to check on the disturbance, and is it, what's your perspective on what it's reasonable for an officer to assume in that situation? I think at that point it's reasonable for the officer to assume that the homeowner is likely in bed, that there's been a civil dispute earlier in the evening, that's what he knows, and that he is likely going to get the homeowner up by shouting at a darkened house sheriff's office one time, and that in rural western North Carolina, a reasonable officer would expect a homeowner to likely have a firearm, and if a homeowner hears a disturbance, they're likely to bring their firearm to investigate a nocturnal disturbance. He's protecting his own family, there's children in the home, and his wife, and he's protecting them, he's bringing it, but he doesn't threaten the officer. What changes, the only thing that changed after the shotgun was racked, is that the deputy moves from a position of safety, behind the door, to a position where he tactically blinds Mr. Nibbs with the light, and then shoots him, even though Mr. Nibbs is not even pointing the weapon at him, and that's the fact. That's true, there's also the officer saying drop it at least once, and I take your point that the evidence in the light most favorable to you is that there wasn't much time to comply, if any. The fact that he can't see if it's been dropped, what do we do with that factor, is it even relevant, because he's in the house and can't hear or see what's going on? Well, a reasonable officer, to take the defense's position in their argument that they're making, their contention is that a reasonable officer, as soon as he heard that shotgun rack from within the house, could shoot to kill, regardless of what he saw after that, because what... is not just that he racked the gun, he loaded the gun, but that when he heard that, he instructed him to drop it, and he didn't, and the officer also assumed that the door was not a safe place, that it was the most unsafe place, because of the person inside would shoot through the door, thinking that's where the officer was, and I assume bullets can go right through the door. I think he assumed that, so he said he had to get out of that highly dangerous situation, he said he thought he was going to be killed, and so he then moved in front of the window. And I understand that that's what he said, but that's a jury issue, Your Honor, because if you at the point that if he says that he had the right to shoot to kill, regardless of... No, he didn't say he had a right to shoot to kill, he said I instructed him to drop the gun, he didn't comply with my order as far as I understood, I was in a vulnerable position behind the door, I couldn't see, the guy had cocked the gun, and he knew he was there, and he had to get out of that place, which was a place where his life was at risk. The difference in why there's a genuine issue of fact is, what does the officer see after that? First of all, he gives him no time to comply, Mr. Nibbs is motionless, and not threatening, and not saying anything, and not doing anything, and not making any... That argument flies in the face of the case where we had, Justice Powell wrote the opinion, where the person that they thought was a gunman turned out to be not a gun, or where the knife was being approached in Sigmund, or the recent Supreme Court case where it was a hammer, guy grabbed a hammer in a garage, and was coming at the officers. These cases all indicate, the question is, the officer has to think quickly, he doesn't have to subject himself to a life, a potential life wound coming at him, and it all develops quickly, and the question is, did he act unreasonably, or would a reasonable officer have thought at that moment, that he was violating the Fourth Amendment? No, I believe he would, because the difference between Sigmund, and Slatterly, and all those lines of cases is that the officer sees movement, sees something happen that causes the officer to feel threatened. In this case, all the homeowner did was walk from the bedroom, and stand six feet behind a closed door with his gun in a safe position, and he didn't do that. What I mean by the critical facts that create the risk, the critical facts is he walked to the door, he loaded the gun, he was ordered to drop the gun, he didn't drop the gun, and now the officer thinks he's ready to get shot. That's the critical facts from the officer's point of view. Right, but a reasonable officer would give Mr. Nibbs an opportunity to comply with this instruction that Sheriff Holland said he didn't have to comply with. A reasonable officer would know that a homeowner doesn't have to disarm himself based upon an unknown person yelling Sheriff's Office one time, and put it down twice. So that's what the Sheriff's Office one time is really contrary to the evidence. As a matter of fact, Freeman heard several calls, but quite apart from that, Freeman was not even being consulted when the Sheriff went the first time, and yelled twice, and pounded on the door, and then came back and did it repeated times, and everybody heard that. But regardless, it's undisputed from the attention of the person in the house, and at first he thought there was no one there, and then he knew somebody was there, and he went and repeated that, and that was heard by everybody. The whole point of my question, and I'm going to back off, I'm going to give you a few extra minutes to respond, but the whole point of my questioning you with this intensity is that we have to start from the officer's point of view, and decide whether a reasonable officer in that position would have thought he was violating the Fourth Amendment. And that's the test under the immunity. Right, I think a reasonable officer knows that he may not shoot a man inside his house who's motionless, and who has only loaded his shotgun, and hasn't made any threats. A reasonable officer knows that under the Fourth Amendment. That's what Cooper says, and that's what Hensley says, that if the gun is in a safe position, mere possession is not sufficient to justify the use of deadly force. The officer knew that. Thank you. Okay, thank you. I didn't want to take up all your time, but I was happy to give you another minute if you had something more to say. No, I've got five minutes in rebuttal, I believe. Okay, we'll come back to you. Yes sir, thank you. And we'll hear now from Mr. Bader. Good morning, and may it please the court, here on behalf of the defendant Appelese. I'm going to dive right into the 1983 qualified immunity section of the argument here, given where some of this initial questioning is gone. When we look at this court's precedent in deadly force cases, what it teaches is that when an officer identifies themselves, when the individual that they identify themselves to, presents some risk of physical harm to the officer or to others, certainly in situations where the officer has reason to believe they may have a weapon, and then third, the officer offers some type of an instruction or a direction to try to diffuse the situation, and the individual does not comply, but the officer does not have to wait to see if the individual intends to shoot first, before deadly force may be used, and qualified immunity would attach. And all that's true as a matter of black letter law, I don't think anybody contests that, but the question in the qualified immunity context is whether there's an immediate threat of harm, and is there a factual issue that's involved? And that's my concern in this case. It's the dead of night, there's no light anywhere, the officer may not be able to see, but there's no indication that the homeowner can see, and he's done, the homeowner's done what I would say nearly every homeowner would do when he's faced with that sort of disturbance. They have a defensive firearm, and they're trying to find out what's going on outside their home. So you have this factual dispute as to, at the time of the shooting, the deputy says, well, the gun was pointed at me, and if the jury finds that to be true and credible, then there's no unreasonable use of force. But there's countervailing factual evidence here from the plaintiff, particularly the plaintiff's expert, that says, well, that couldn't have been the case, that based on the wound pattern, maybe the jury believes that, maybe they don't. He had to be standing somewhat like this. And there's an awful lot of homeowners who would be doing exactly that, faced with these circumstances. The blue lights aren't on. I don't think we can assume that the homeowner knows for sure it's a police officer. I think the widow testified that he didn't think it was a police officer. And that seems to create a jury question that would go to the credibility of the witnesses. And in that regard, you know, looking at the investigative interview where the deputy Mumford testified, he said that he didn't know if Mr. Kibble's firearm was shouldered. I don't know if it was shouldered. I don't know if it was under his arm. I know he was standing canted to me, which would be this position, that someone could usually shoot from. But if that's your evidence, why isn't this a factual dispute for the jury? Well, Judge, that was a lot for me to digest, so let me make sure I can be responsive. I think to the critical question, where the gun was pointed, that's not dispositive. The question is, how would a reasonable officer react to the circumstances being that they announced? Well, on the contrary, that may be dispositive. I mean, it's not open season for a frightened police officer to shoot an innocent homeowner in their own home because he's afraid that someone who's not pointing a gun at him might at a later point in time do that. But what's critical here is that he has identified himself, he has gone to the door and knocked, and what he's been greeted with in response is the sound of a shotgun shell being forced into the chamber. And when we look at the cases that Mr. Nibbs and his counsel have relied on, Cooper, Pena, and Hensley, those cases do not involve those critical facts. In those cases, the officers did not announce their presence. In those cases, they encountered a homeowner who had a weapon that, I believe in all three of those cases, was not directed at the officers, and then with no direction, warning, command of any kind, the officers react by shooting the homeowner. And the critical facts in those cases and why qualified immunity became a jury question is, it turns on that. That is distinct from the cases that we cited, namely Slattery and Russell, where an officer has identified themselves to an individual, they are... I just came down for the Supreme Court. There's something furtive being done by the person who got shot. They're coming at him with a hammer in a position to strike. They're reaching for something that turns out not to be a weapon, but they're doing something. Whether they're reaching for a knife, or they're reaching for a can of beer, or in one case, the guy's reaching for his Walkman. But here, my question goes to, here you have a plaintiff's evidence, which is that the guy's just standing there. He's not pointing the weapon. There is no furtive movement under the plaintiff's evidence. That may be true, but I would take the position that a furtive movement isn't necessarily the critical question. The question, again, from the perspective of a reasonable officer on scene, is whether there's probable cause to believe that that person presents a risk of physical harm. I don't think that necessarily requires a furtive movement. In this case, we have an individual that, again, racked a shotgun or a shell directly into the chamber of their shotgun after the officer announced themselves. That is a deliberate action that was taken. That type of action was not taken in Cooper, Pena, and Hensley, and that further distinguishes this case from those cases. And to your Honor's point, referencing Slattery and Russell, you had an officer that had identified themselves that was dealing with an individual that they had reason to believe had a weapon, a weapon that was not pointed at them at that point would have been concealed. They make a direction to that individual to comply, if for no other reason than to try to diffuse the situation, and the individual does not respond to the command, which lines up neatly with the facts that we have here. Well, counsel, I think one fact that doesn't line up neatly, and I asked your opponent about this, is that the officer can't see what is going on. The person he's coming to talk to is inside his own home in the dead of night, and he brings a loaded weapon to see who's at the door. Your position, I take it, is your response to Judge Agee's questions about it not mattering the position of a gun, I take it that your position is if an officer announces himself and hears a shotgun rack and has no reason to think that the person has set it down, although he can't see, then it's reasonable for him to assume that he's being hunted and will be tracking there. Is that your position, and if so, how is that reasonable? Well, I wouldn't say being hunted and use some of the terminology that your Honor used in her question, but I think it's more than just that, which is that at that point when he perceives that he is in danger because he's heard the shotgun rack and he's not getting a response from the individual on the other side of the door, he doesn't have to wait to be shot. Is he? I mean, there's a rock wall. I looked at the pictures. This is a stone home, right? There's rock walls and a solid door, and he heard the shotgun rack before he stepped on the porch, right? He's about to step onto the porch from the stairs. Is it reasonable to assume that your life is in danger at that point when, and I take counsel's point, when a homeowner in rural But I think we have to look at really what happens next leading up to the shooting, which is that the deputy makes a decision at that point to try to get off the porch using what he believed to be the safest way off, and when he does that, there is no dispute that what he sees is an individual that is at minimum possessing a firearm and that is clearly not put that shell on the chamber indicating at least some potential intent to use his weapon. It might be useful also if you were to note that leading up to this, this is not just a homeowner trying to protect his house. The conclusion would be just the opposite because this person had laid out boards, which the officer reasonably believes had nails in it, that there had been a dispute that this man was intoxicated and he was in basically a rebellious state with respect to his neighbor, and so you're coming into a circumstance where now he refuses to answer the door, and then when the officer discovers he's there, that's even a more indicative situation where the guy is holing up, and he then comes down and doesn't obey the order, doesn't respond, say, I'm complying or whatever. He basically stands behind the door. The officer can't see. That's the big problem, and he knows the gun's been loaded, and he knows the man's not obeying the officer's order. Those are the undisputed facts that the officer takes, not an innocent homeowner sleeping at night in western North Carolina. And I would agree with that, Judge Niemeyer, and also point out that those facts are further distinct from the case law that's been briefed before the court, and I just want to mention one other case. The Supreme Court has relied on that. As a matter of fact, it always discusses that lead up. I mean, the officer's making a judgment call, and he doesn't have to put his life in the line when he reasonably believes his life's at risk. That's right, that's right, and I would, to this court in my brief, Elliot versus Levitt, a 1996 opinion from this court, has a critical factual distinction, which is apparently in that case the suspect was aiming the handgun at the officer, but it's notable, really what it stands for is that same idea that we don't second guess officers in the field, but in that case you had a suspect that was handcuffed in the back of a squad car in response to a DWI arrest. The officers are and sees this individual moving something behind its back, suggesting that he's looking for a firearm, and when the court specifically says there, well, the fact that there is a car window that may be in place doesn't necessarily preclude the officer or reasonable officer in that circumstance when they've identified themselves, and there's also a warning in that case, a warning has been given, and the individual is not complying, the deadly force may be appropriate. Counsel, am I correct that Deputy Mumford testified that when he turned the flashlight on that Mr. Knibbs was pointing the shotgun at him? I believe that's correct, yes. But there's also what the deputy told the investigating officer that he didn't know if the gun was shouldered, he didn't know if it was under his armpit. Doesn't that create a credibility question that ought to go to the jury? It does not, Judge Agee, for the reasons that I've argued, which is you still have, you're still asking how a reasonable officer in that circumstance, what they would perceive, and for all the reasons we've discussed, at minimum, he's got an individual who's not compliant with his direction, who is possessing a firearm, and who previously had made some use of that firearm in the form of racking the shotgun, to suggest that he may intend to use it. I don't want to lose this thread if the panel has any more questions, but I do want to make sure I touch on the state law claims before my time expires. I'll try to hit on these claims effectively here with the time that I have left. Don't they follow the conclusions with respect to the federal claim? In other words, once you have a conclusion that the officer is not reasonable, or that he's reasonable, don't the state claims rise and fall on those? I think that they do, Your Honor, but there is some argument that at least the state law tort claims where there would need to be a showing of malice to overcome public official immunity, at least from Mr. Nibb's perspective, is a somewhat different standard. I don't think that this court needs to resolve that legal question. For all the reasons that we've discussed, there's no malice, but in addition to that, when the court looks at North Carolina precedent on malice, you've got an officer who is acting contrary to their duties, and who intends to injure, judge from the subjective intent of the officer. In addition to all the facts that we've referenced, there is no racial bias involved in this case. There's no socioeconomic bias involved in this case. These individuals do not know each other. They have a very brief, unfortunate, and tragic exchange. There's no ongoing- Counsel, the Bailey case, we quoted North Carolina law to mean that an officer acts with malice when he does that, which a man of reasonable intelligence would know is contrary to his duty. Where do you get this additional requirement of racial bias and all that stuff? It's not an additional requirement. If I misspoke, that was not my intent. In some of the case law, Doe v. Charlotte, a recent North Carolina Court of Appeals opinion, considering malice, the court said, well, these are the facts that we're looking at here that have been presented to us that- Do you agree with our quotation of North Carolina law that malice is established if an officer acts contrary to his duty, knowingly acts contrary to his duty, or with a man of reasonable intelligence would know, an objective question? I certainly do, Your Honor. Of course, building on that, with an intent to injure, judge subjectively against that particular officer. What about, let me ask you specifically about the surety bond claim. I mean, that's a small dollar amount claim, but does the plaintiff have to prove malice and wanton acts in that circumstance, or is that just a pure negligence standard? In this case, they would have to show that Deputy Mumford would not be entitled to public official immunity on the state law claims. And here's the reason why, and as I was going through my briefing in preparation, I wish I would have been clear on this, so I'm glad I get an opportunity to address it. The public official immunity, I'm sorry, the official capacity claim against the sheriff and the bonds rises and falls solely on the theory that the sheriff is vicariously liable for the deputy's individual capacity claim. If you look at their brief section three, that is the only issue that's raised. And I mentioned that because I also pointed out in our briefing that there were other theories of liability that were pleaded and litigated at the summary judgment stage, but they were all waived on appeal. So the only argument that's been raised on appeal is again, this official capacity vicarious liability theory. So they really will rise and fall together if they're, because the deputy has public official immunity for the individual capacity claim, the sheriff cannot be liable for the official capacity claim. And by extension, there can be no recovery against the bonds. So are you agreeing that if we don't think there's qualified immunity here, so there's not public official immunity at this point, that the 25,000 surety bond waives the sheriff's immunity or waives sovereign immunity to the extent of the surety bond? I am. Yes. Okay. And then last, I just want to briefly touch on and clarify the state law constitutional claims, the quorum claims. And really the distinction here is between sovereign immunity and public official immunity. And the Craig versus new Hanover case, the defendant had governmental sovereign, sovereign immunity. You cannot get to the courthouse steps against that particular defendant. And so in that analysis, the North Carolina state or Supreme court said, well, you may be able to bring a direct constitutional claim because of that governmental immunity. But if there is a potential for an individual capacity claim that gets you to the courthouse steps. Now that claim may be barred because the facts show that public official immunity attaches, but you still get to the courthouse steps. State law provides an adequate remedy and you do not have a direct claim under quorum. And that's the analysis that I set out in our brief that the court of appeals, North Carolina court of appeals did into bond follows from another case called Wilcox and we'd asked summary judgment in this case for all of the defendants that believe to be affirmed. I see I have 30 seconds left. I certainly am happy to answer any further questions the panel would have. Otherwise, I thank you for your time this morning. All right. Thank you, Mr. Bader. Mr. Melrose. Thank you, Your Honor. Let me point out a couple of quick things. First, I believe I hear Mr. Bader say that at minimum, the cases are mandated back for a trial since governmental immunity has been weighed at least up to the amount of the surety bound of 25,000. They just the opposite. But I hear him say that today. That's the Lee versus Seaboard cases case, Your Honors. That case said the defendant in Seaboard admitted that governmental immunity was weighed by the purchase of insurance. In that case, we have purchase of insurance in this case with the Ohio casualty bond. That's pure negligence and gross negligence and negligent excessive use of force. It's the Lee versus Seaboard case. So we get a trial at least. Right. But you're insurance, putting the surety bond aside, your insurance policy has a specific exemption in it. And my understanding was the North Carolina court said that that exemption was valid. So if that's the case, you're just looking at the surety bond as a possible recovery. I think that's true, Your Honor, except for a separate question, which is not right for the court's hearing today, is whether a limit of $25,000 is an adequate state remedy. And that's a separate case for a later date if there's a verdict in the plaintiff's favor. Let me also point out footnote four in the Lee versus Seaboard case explicitly says even if there is no violation under the Fourth Amendment, there may be liability under North Carolina law. North Carolina law, then, this case still goes to trial under North Carolina tort law. Wilcox versus Asheville clearly allows us to go to court on the state tort claims of excessive use of force, as does Lee versus Seaboard, which recognize the same principle. One other thing I would like to point out is when we talk about the objective officer standard and what he knew and the information he had, our evidence is that Deputy Monford was thinking in a delusional, irrational fashion. As soon as he heard that shotgun being racked, he says, I knew he was going to use it. And that essentially game over at that point for Mr. Nibbs as soon as he racked the shotgun. Regardless of what happened afterwards, even though he's in rural Western North Carolina and would reasonably expect somebody to be armed and investigating. And remember, your honors, that earlier in the evening, there had been a dispute between Mr. Nibbs and Mr. Freeman about what had been going on with the driving too fast up and down the road and the boards and things like that. It would not, a reasonable officer would believe that the homeowner might very well suspect that the neighbors were coming down the hill to make trouble. There's no reason that he would expect an officer to be out there because he didn't see any blue lights, uniform, et cetera, et cetera. So Deputy Monford comes to this imaginary fantastical belief that based on the racking of the shotgun that Mr. Nibbs has now decided to kill him, to kill Mr. Freeman, and to kill every other officer who came to the scene. That's what he told the SBI within about 12 hours. And he uses colorful expletives to talk about his perceived animosity that's coming from Mr. Nibbs and how Mr. Nibbs was out to hunt him down and stalk him like prey and hunting him in the dark. None of which was true. And that's not reasonable for an officer who's investigating a civil right-of-way dispute where no crime had been committed. And he admitted that there was no probable cause for any crime at that point. The most that this could be is an attempted injury to personal property. So he's coming down to investigate basically a dispute that he can't resolve to talk. Of course, that's irrelevant when we're talking about officer safety. An officer can simply be investigating. There are all kinds of hypotheticals or circumstances. So there's no issue here as to whether a crime was being committed. The sheriff came out to investigate a complaint. Yes, sir. And I agree except for under the state tort law, the totality of the circumstances and what our expert Mr. Blum says about the violation of police procedures and the escalation of this incident and the false sense of urgency and the fact that the deputy goes from a position of cover to a position of danger and tactically blinds him. That's basic tort law. And that is what Lee says and what Wilcox says goes to the jury on the negligence claims. Whether we're limited to $25,000 or not is a separate issue. We think we go forward on the, just as Judge Agee wrote in the Hensley case, when there's a factual dispute about which side of the gun is pointing, the decision whether to shoot to kill that Deputy Monford made is at the time he shoots him. So if the gun is being racked and then these instructions put it down, put it down or being given and there's no time to comply, the next thing that happens is he sees a man that's not pointing a gun at him. He sees a man who poses no threat. So if we examine at that time and the jury gets to parse those facts, then we get to go to the jury to establish that the officer could not have reasonably believed that there was a threat to his safety at the time that he pulled the trigger. And then beyond that, he didn't tell the truth about what he saw or he didn't understand what he saw because he tells various stories about it. Thank you very much. All right. Thank you, Mr. Melrose. I want to thank counsel for their arguments. Our practice would be to come down and greet counsel. We obviously can't do that. So our thanks and greetings will have to suffice for today, but we welcome you back to the Fourth Circuit.
judges: Paul V. Niemeyer, G. Steven Agee, Allison J. Rushing